**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 2:19-cr-8-NR |
| v. | ) | |
| | ) | |
| NOAH LANDFRIED, MICHEL | ) | |
| CERCONE & ANTHONY SMITH | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION ON PRESENTENCE INVESTIGATION REPORT OBJECTIONS**

On December 14, 2021, the jury entered a guilty verdict against Defendants Noah Landfried, Michel Cercone, and Anthony Smith. Defendants are now awaiting sentencing. The probation office filed presentence investigation reports for each Defendant. Pending before the Court are Defendants' various objections to those reports. While each Defendant raises specific objections that are unique to their own reports, they all object to the drug quantities attributed to them.

After careful consideration, the Court sustains in part and overrules in part Defendants' objections, for the reasons explained below.

**DISCUSSION & ANALYSIS**

**I.   Noah Landfried.**

Mr. Landfried raises three separate objections to his PSR. He objects to: (i) the description of the nature of his conviction; (ii) the drug quantities attributed to him; and (iii) the application of a four-level enhancement for his role in the conspiracy as an organizer or leader. After reviewing the record in detail, the Court overrules these objections.

**A.   The Court overrules Mr. Landfried's objection to the nature of his conviction.**

Mr. Landfried first objects "to the extent [paragraph 9 of his presentence report] suggests that [he] was convicted of conspiring to distribute illegal synthetic

cannabinoids or oxycodone." ECF 3343, p. 1. That's because, according to him, "[t]he verdict issued by the jury does not specifically yield such a conclusion." *Id.* The Court does not agree.

The Court previously addressed this argument with Mr. Landfried and his co-Defendants. This argument is predicated on the fact that the special interrogatories on the verdict form only specify that the jury convicted Mr. Landfried of conspiring to distribute a specific drug-quantity range for cocaine, fentanyl, and heroin. ECF 3133, p. 2. The special interrogatories address neither synthetic cannabinoid controlled substances nor oxycodone. *See id.* The reason for this difference, however, is straightforward: the substances listed required a special interrogatory for *Apprendi* reasons. In other words, because those substances might carry a mandatory minimum sentence, the jury had to make a specific finding about the quantity of the substance involved. ECF 3189, 145:8-16, 146:3-19, 150:23-152:25. There was no such requirement for synthetic cannabinoid controlled substances or oxycodone. The jury's verdict form does not preclude a finding that Mr. Landfried was convicted of conspiring to distribute those other substances; it simply reflects that a specific drug-quantity finding for those substances was not required.

In fact, the evidence presented by the government supports a finding that Mr. Landfried conspired to distribute a quantity of synthetic cannabinoids. For example, James Perry testified that he produced about 500 pages of K2 paper with Mr. Landfried in Mr. Perry's garage. ECF 3186, 73:19-75:23. Mr. Benavides testified that he also helped Mr. Landfried make K2 paper. ECF 3448, 24:20-34:2. Joseph Spencer testified that he saw Mr. Landfried making K2 paper in Mt. Washington. ECF 3187, 46:12-47:16.

There is also ample evidence that Mr. Landfried conspired to distribute oxycodone in the form of "Perc 30" pills. Mr. Landfried was recorded discussing how Michel Cercone had about 250 "30s" and that "everybody wants them." Trial Exs. 3-

4.  He separately told James Perry that he had "pills coming" from Krystian Zarate and that he was "cool with the price" and was "gonna start with 3,000." *Id.* Joseph Spencer testified that Mr. Landfried supplied him with about 10,000 Perc 30s in 2017 and 2018.  ECF 3187, 44:2-20.  Larry Benavides also testified that he received Perc 30s from Mr. Landfried.  ECF 3448, 40:1-8.

**B.  The Court overrules Mr. Landfried's objection to the drug quantity attributed to him in the PSR.**

In determining Mr. Landfried's base offense level for his Sentencing Guidelines calculation, the probation office attributed 13,350.42 kilograms of "converted drug weight" to him.  The probation office used converted drug weight because the jury convicted Mr. Landfried of conspiring to distribute more than one substance.  USSG § 2D1.1(K), Application Note 8(B). The probation office broke down that quantity as follows:

| Drug Name | Drug Quantity | Converted Drug Weight |
|---|---|---|
| Cocaine | 55 kg | 11,000 kg |
| Fentanyl | 93 kg | 232.50 kg |
| Heroin | 100 g | 100 kg |
| Synthetic Cannabinoids | 1,251 g | 208.92 kg |
| Oxycodone (actual) | 270 g | 1,809 kg |
| **Total** | | 13,350.42 kg |

Mr. Landfried objects to the quantities of "cocaine, oxycodone and synthetic cannabinoids set forth in the PSR" because, according to him, they "are not supported by any evidence having an indicia of reliability."  ECF 3343, p. 3.

"At sentencing, the government bears the burden of proving drug quantity by a preponderance of the evidence."  *United States v. Douglas*, 885 F.3d 145, 151 (3d Cir. 2018) (cleaned up).  Sentencing courts have the discretion to consider a broad

array of information, including even acquitted conduct. *United States v. Watts*, 519 U.S. 148, 149 (1997).

"When sentencing a defendant for a drug-related conviction that involves some quantity of unseized drugs, a district court must approximate the quantity of the controlled substance." *United States v. Gordon*, No. 20-1596, 2021 WL 3781722, at *2 (3d Cir. Aug. 26, 2021) (cleaned up). "Altogether, the evidence need not be admissible at trial, but it must possess sufficient indicia of reliability to support its probable accuracy." *Id.* (cleaned up). That indicia of reliability may be met through "corroboration by or consistency with other evidence[.]" *United States v. Freeman*, 763 F.3d 322, 337 (3d Cir. 2014) (cleaned up). The other evidence need not be direct evidence; circumstantial evidence may properly support a sentencing court's determination of drug quantity. *Douglas*, 885 F.3d at 151. And the Court "may credit hearsay evidence over sworn testimony," but, consistent with the above, there needs to be "other evidence to corroborate the inconsistent hearsay statement." *United States v. Miele*, 989 F.2d 659, 664 (3d Cir. 1993) (citation omitted).

"[A] defendant convicted of conspiracy may be liable for drug weights that she did not herself distribute or even know about." *United States v. Whitfield*, 89 F. Supp. 2d 587, 589-90 (E.D. Pa. 2000) (citations omitted). In this scenario, "courts should look to the defendant's role in the conspiracy, focusing on whether the drug quantities were reasonably foreseeable given the scope of the conduct to which the defendant herself agreed." *Id.* at 590 (citing *United States v. Collado*, 975 F.2d 985, 995 (3d Cir. 1992)). This analysis requires "a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy[.]" *Id.*

Mr. Landfried first challenges the statement in his PSR that he was responsible for the distribution of 55 kilograms of cocaine, which translates to 11,000 kilograms of converted drug weight. He objects to this statement because he believes it is "based on the testimony of James Perry," which Mr. Landfried considers to be

unreliable.  ECF 3443, p. 3.  The decision on this initial objection is outcome-determinative on Mr. Landfried's overall objection because this quantity of cocaine, if adopted, would be enough to support the determination of his base offense level based on drug weight.[1]

This disputed drug quantity is directly supported by Mr. Perry's testimony that he observed a source called "Jungle" supply Mr. Landfried with 35 kilograms of cocaine and a co-conspirator, Richard Jasek, supply him with at least another 20 kilograms.  ECF 3186, 66:3-67:13.  That quantity is also corroborated by several additional pieces of information.

Mr. Perry further testified about the many people to which he delivered cocaine on Mr. Landfried's behalf.  *Id.* at 95:17-98:5.  A different co-conspirator, Richard Wood, testified that he received around 20 kilograms of cocaine from Mr. Landfried.  *Id.* at 156:21-157:19.  Joseph Spencer, an unindicted co-conspirator, testified that he received another 8 to 12 kilograms of cocaine from Mr. Landfried that Mr. Perry did not mention during his testimony.  ECF 3187, 45:2-20.  Keith Stamper, one of the case agents, testified that another unindicted co-conspirator, Marvin Younger, told him that Mr. Landfried provided Mr. Younger with two kilograms of cocaine and that Mr. Landfried told Mr. Younger he "had 20" kilograms.  ECF 3448, 81:18-83:8.  All this cocaine distribution activity is also corroborated by Mr. Landfried's own coded statements recorded on wiretap.  *See* Trial Exs. 3-4.

Mr. Landfried's main bone of contention with the cocaine quantity is that although Mr. Perry "was involved, in some way, with every single gram of cocaine that Mr. Landfried is alleged to have distributed," Mr. Perry's own "plea agreement limited [his] responsibility to a quantity of 5 kilograms of cocaine[.]"  ECF 3343, p. 3.

---

[1] One gram of cocaine equals 200 grams of converted drug weight, so 55 kilograms of cocaine equals 11,000 kilograms of converted drug weight—the threshold for Mr. Landfried's base offense level based on drug quantity.

Based on that fact, Mr. Landfried contends that Mr. Perry's and, by extension, Mr. Landfried's alleged "involvement with 55 kilograms of cocaine is not credible." *Id.* at p. 4. He makes a similar argument over the 20 kilograms of cocaine that Mr. Landfried allegedly obtained from Mr. Jasek. *Id.* at pp. 4-5. Mr. Landfried claims that Mr. Jasek pled guilty to only "3 kilograms of cocaine" and that the "government flatly disregarded the information" that Mr. Perry provided about "the quantity of cocaine he attributed jointly to Mr. Landfried and [Mr.] Jasek." *Id.* at p. 5. And since the government ignored that information, so too should the Court. *Id.*

Mr. Landfried's argument misses the mark for at least two reasons.

First, the circumstances of other Defendants' plea agreements are not before this Court in the present proceeding, and as such, this Court must only consider the evidence as it relates to Mr. Landfried. *See, e.g.*, *United States v. Hoang*, 285 F. App'x 133, 138 (5th Cir. 2008) ("With respect to other members of the conspiracy, many of whom pleaded guilty and cooperated with the Government, the district court noted when sentencing John that the circumstances of their agreements were not before it and observed that it had to consider the evidence in this particular case. We cannot say that the district court's determination of the sentence was unreasonable."). Here, the evidence supports a finding that Mr. Landfried is accountable for the drug quantity set forth in his PSR. *See United States v. McRae*, 235 F. App'x 968, 969 (4th Cir. 2007); *United States v. Pruneda*, 518 F.3d 597, 607 (8th Cir. 2008) ("That Pruneda was held responsible for a smaller drug quantity does not establish that the district court committed clear error with respect to Garcia-Delacruz.").

Second, even if the circumstances of Mr. Perry's plea were properly before the Court, Mr. Perry's testimony does not conflict with the factual basis for his plea agreement. At his plea hearing, Mr. Perry admitted that he was responsible for the distribution of at least five kilograms of cocaine. There is nothing inconsistent with Mr. Perry admitting responsibility for a minimum amount of cocaine that falls below

the testimony he later provided at trial and the evidentiary hearing the Court held on Mr. Landfried's objection to his PSR's drug quantity calculation. The same goes for Mr. Jasek, who admitted that he was responsible for **_at least_** 500 grams of cocaine.[2]

Mr. Landfried next argues that Mr. Perry's testimony is unreliable because it's too vague. _See_ ECF 3343, p. 5. That is, Mr. Landfried complains that Mr. Perry could only provide a rough estimate of the amount of cocaine he distributed on behalf of Mr. Landfried, and his testimony at trial appeared to contradict his testimony before the grand jury. _Id._ at pp. 5-6. It is true that Mr. Perry could only approximate the total amount of cocaine that was supplied to Mr. Landfried through his two primary sources. ECF 3186, 66:22-25. But approximation in a case like this one where the drugs aren't seized is acceptable, so long as there is some other evidence to back up the calculation. _United States v. Diaz_, 951 F.3d 148, 159 (3d Cir. 2020). And here, there is.

In sum, Mr. Landfried asks the Court to disregard the testimony of all these separate witnesses and ignore his recorded statements in the wiretap to reach a conclusion that he is only responsible for five kilograms of cocaine, an amount that contradicts the voluminous evidence in the record. That is a bridge too far, and therefore the Court overrules Mr. Landfried's objection to the cocaine quantity in the PSR. _See, e.g._, _United States v. Gray_, 395 F. App'x 896, 900 (3d Cir. 2010) ("Shepherd testified that, beginning in early 2005, he would sell cocaine to Gray once every week

---

[2] As has been evident in this multi-defendant case, many defendants have pled guilty to "lesser included" offenses and have reached certain agreements as to recommended or stipulated drug quantities as part of their plea agreements. These sorts of bargains do not necessarily reflect the actual drug quantity at issue, and can, in the Court's experience, simply reflect the relative risks as to the strength or weakness of the evidence had the case gone to trial. Unlike these defendants, Mr. Landfried did go to trial, was convicted, and evidence was presented there and at sentencing as to drug quantity. It is that evidence that controls, not recommendations or stipulations in a bargained-over plea agreement involving another defendant.

or week and a half. At first, these sales involved one kilogram of cocaine, but by the winter of 2005, Shepherd was regularly selling Gray three kilograms of cocaine at each meeting. Additionally, Gray would sometimes purchase more than three kilograms of cocaine. Gray continued to buy three kilograms of cocaine every week to week and a half from Shepherd at least until the spring of 2006. Moreover, Shepherd testified that on October 30, 2006, Gray gave him $60,000 to purchase three kilograms of cocaine. According to Shepherd's testimony, he directly sold to Gray at least 50 kilograms of cocaine over the course of the conspiracy. Therefore, the district court did not clearly err in finding that the drug weight amounted to between 50 and 150 kilograms of cocaine throughout the duration of the conspiracy.").

Because the cocaine quantity is independently sufficient to establish a converted drug weight quantity of at least 10,000 kilograms—the amount justifying his base offense level, the Court need not address Mr. Landfried's objections to the drug-quantity calculations for the other substances listed in the PSR

That said, after carefully considering the entire record, the Court overrules these objections to the drug-quantity findings for the other controlled substances. The evidence supporting these findings is summarized as follows:

| Drug Name | Quantity | Supporting Evidence |
| --- | --- | --- |
| Fentanyl | 93 grams | Verdict Form, ECF 3133; Trial Exs. 5-7, 28; Testimony of Mr. Spencer, ECF 3187, 49:17-18 (Mr. Landfried provided 92 bricks of heroin); Testimony of Mr. Benavides, ECF 3448, 40:14-42:12 (Mr. Landfried would provide him with fentanyl; he witnessed Mr. Landfried with an amount of fentanyl that looked like a "grapefruit and a half"); Testimony of Keith Stamper, ECF 3448, 94:16-25 (Mr. Benavides told him that Mr. Benavides observed Mr. Landfried with at least 30 grams of fentanyl) |

| Heroin | 100 grams | Testimony of James Perry, ECF 3186, 82:21-83:22 (obtained one kilogram of heroin from Mr. Jasek for Mr. Landfried), 84:14-18 (observed Mr. Landfried get sick from mixing heroin the night before) |
|---|---|---|
| Synthetic Cannabinoids | 1,251 grams | Testimony of James Perry, ECF 3186, 73:19-74:12 (produced 500 pages of K2-soaked paper for Mr. Landfried); Testimony of Larry Benavides, ECF 3448, 26:21-31:2 (helped Mr. Landfried make "thousands" of pages of K2 paper during the time he lived in an apartment owned by Mr. Landfried and his family); Testimony of Joseph Spencer, ECF 3187, 46:12-47:16 (witnessed Mr. Landfried producing K2 paper in Mr. Washington area of Pittsburgh) |
| Oxycodone | 270 grams | Trial Exs. 3-4; Testimony of Joseph Spencer, ECF 3187, 44:2-20 (received "roughly 10,000" "Perc 30" pills from Mr. Landfried); Testimony of Larry Benavides, ECF 3448, 40:1-5 (received "[m]aybe a hundred, couple hundred" Perc 30s from Mr. Landfried); Testimony of Keith Stamper, ECF 3448, 80:1-81:7 (an unindicted co-conspirator, Marvin Younger, worked his way up to receiving 400 Perc 30 pills at a time from Mr. Landfried); ECF 3548, p. 14 (27 milligrams of oxycodone in actual Percocet); *id.* at pp. 23-24 (attributing only 10,000 pills is conservative based on all record evidence) |

**C.    The Court overrules Mr. Landfried's objection to the application of a four-level enhancement based on his role as an organizer or leader.**

Finally, Mr. Landfried objects to the application of a four-level enhancement "because he was not an organizer or leader of criminal activity that involved five or more participants." ECF 3343, p. 11. Mr. Landfried argues that "[c]onsidering the evidence presented at trial, the only two persons who could be considered to have been supervised or managed by Mr. Landfried would be Michelle [sic] Cercone or James Perry. All other persons were simply Mr. Landfried's customers." *Id.* at pp.

11-12.  Mr. Landfried's argument is not well-taken and so the Court overrules his objection.

"The defendant need not have directed the activities of five or more persons; rather, five persons must have been involved in the conspiracy." *United States v. Ugochukwu*, 538 F. App'x 674, 681 (6th Cir. 2013) (cleaned up); *see also United States v. Speight*, 852 F. App'x 696, 698 (3d Cir. 2021) ("But the evidence in the record supports the finding that Speight led a conspiracy consisting of five or more participants: Speight admitted at his guilty plea to a leadership role and the presentence report and change-of-plea colloquy describe at least five other participants, three of whom were prosecuted.").

Mr. Landfried concedes that he held an organizer role over Ms. Cercone and Mr. Perry.  And the trial evidence establishes that the conspiracy involved far more than five participants, including at least Mr. Landfried, Ms. Cercone, Mr. Smith, Mr. Perry, Mr. Wood, Mr. Zarate, Mr. Jasek, Mr. Spencer, Mr. Gahagan, Mr. Evans, and others.  The enhancement applies.

## II.    Michel Cercone.

Ms. Cercone raises four objections to her PSR.  She objects to: (i) the description of the nature of her conviction; (ii) the drug quantities attributed to her; (iii) the application of a two-level enhancement because the controlled substances were distributed in a prison; and (iv) the calculation of her total offense level.  After reviewing the record in detail, the Court overrules these objections.

### A.    The Court overrules Ms. Cercone's objection about the nature of her conviction.

Ms. Cercone argues that there was insufficient trial testimony to establish that she "had any involvement in the distribution of K2 or that any proceeds funneled to her by way of US Treasury checks from incarcerated individuals were thereinafter used for the procurement of K2 paper."  ECF 3332, p. 2.  The Court disagrees.

There was testimony offered at the pre-sentencing evidentiary hearing that established Ms. Cercone's involvement in the distribution of synthetic cannabinoid controlled substances.  For example, Mr. Benavides testified that he witnessed Ms. Cercone helping Mr. Landfried produce K2 paper at an apartment owned by Mr. Landfried's family and rented to Mr. Benavides.  ECF 3448, 24:20-34:2.  Specifically, he testified that he saw Ms. Cercone wearing a mask and "hanging, drying, and preparing the K2 paper like they always—like it was always done."  *Id.* at 33:7-11.  Ms. Cercone was "handling the paper, either taking it down or putting it up."  *Id.* at 33:19-20.  The Court finds this testimony to be credible.

As for the treasury checks, the government need not prove that the funds were used for the specific purpose of procuring K2 paper.  Instead, it only needs to show that the proceeds came from a "specified unlawful activity."  *United States v. Coles*, 558 F. App'x 173, 179 (3d Cir. 2014)  It has done so; the jury could only convict Ms. Cercone at Count 2 if it found the government had established that element beyond a reasonable doubt.

### B. The Court overrules Ms. Cercone's objections to the drug-quantity calculation in her PSR.

Ms. Cercone next objects to paragraph 11 of her PSR because the information "fails to provide sufficient indicia of reliability to support the conclusion that [she] should be attributed a converted drug weight of 1,197.60 Kilograms."  ECF 3332, p. 3.  Not so.  The drug weight set forth in the PSR is supported by Ms. Cercone's own admissions.

After Ms. Cercone was indicted, she agreed to conduct a proffer interview with law enforcement.  ECF 3448, 84:2-4.  Before giving that interview, Ms. Cercone entered into a proffer agreement.  *Id.* at 84:4-7.  Her attorney was present when she signed the agreement.  *Id.* at 84:8-10.  The agreement included a provision that stated if Ms. Cercone "should present a position contrary to the proffer through witness

testimony or through written or oral argument by counsel, the prosecution [is] completely free to use [Ms.] Cercone's statement from the proffer at any stage of the prosecution of [Ms.] Cercone." *Id.* at 84:17-24.

During her proffer interviews, Ms. Cercone admitted that she received five kilograms of cocaine from Mr. Landfried at a cost of $34,000 for each kilogram. ECF 3448, 89:12-90:25. She also admitted that she later sold those kilograms to someone named John Burns. *Id.* These admissions were corroborated by testimony from Mr. Perry. He testified at trial that he "picked up around $64,000" from Ms. Cercone as payment for cocaine that Mr. Landfried had supplied her. ECF 3186, 59:2-60:2. And they were also corroborated by Joseph Evans's testimony that he knew that Ms. Cercone was involved in cocaine trafficking and that he discussed cocaine pricing with her. ECF 3188, 88:17-89:7.

The five kilograms of cocaine for which Ms. Cercone admitted responsibility translates to 1,000 kilograms of converted drug weight. That alone supports the determination of her base offense level based on drug quantity in her PSR.

Ms. Cercone argues that the government cannot use, and the Court cannot consider, her admissions during her proffer interviews because she did not "knowingly and voluntarily waive[] her right to preclude the use of [those] statements at sentencing." ECF 3561, p. 7. That's not true, though. Ms. Cercone waived that right when she breached her proffer agreement by taking a position inconsistent with her proffer statements during sentencing.[3]

Through counsel's argument, she claims that the drug quantity set forth in her PSR is unsupported. Ms. Cercone argues that in making this claim, she isn't ***specifically*** objecting to the quantity of cocaine attributed to her, which would

---

[3] "[A] proffer agreement operates like a contract; accordingly, we examine its express terms to determine whether [a party] is in breach." *United States v. Gillion*, 704 F.3d 284, 292 (4th Cir. 2012).

conflict with her admissions during her proffer interviews, but rather she is objecting *generally* to the total quantity attributed to her.  *See id.* at p. 9.

This is a lawyer's legerdemain and the Court rejects it.  By objecting to the total weight, she is necessarily objecting to the component parts.  Thus, the Court can consider her admissions related to her distribution of cocaine from her proffer interview.  *See, e.g.*, *United States v. Elshinawy*, No. 16-009, 2018 WL 1521876, at *39 (D. Md. Mar. 28, 2018) (allowing use of statements made during proffer interview where defendant tried to prove something "materially different than what he admitted during the proffer session"); *United States v. Hughes*, No. 21-4050, 2022 WL 2206891, at *2 (4th Cir. June 21, 2022) ("Because Hughes later breached the proffer agreement by refusing to take a polygraph test, the Government was justified in using Hughes' drug-weight statement against him at sentencing."); *United States v. Valencia-Lopez*, 792 F. App'x 846, 848 (2d Cir. 2019) ( "In addition to the PSR, district courts may consider a broad range of sources in making factual determination as to drug weight, including the defendant's statements during a safety valve proffer." (cleaned up)); *United States v. Petrosian*, 446 F. App'x 826, 828 (9th Cir. 2011) (holding that district court did not err in admitting statements made during proffer session where defendant breached proffer agreement through lack of candor).

Because the amount of cocaine is independently sufficient to support the total amount of converted drug weight, the Court overrules Ms. Cercone's objection to drug quantity.

That said, as with Mr. Landfried, the record supports attributing additional converted drug weight to Ms. Cercone for other substances, including oxycodone and synthetic cannabinoids.  The evidence supporting such an attribution is summarized as follows:

| Drug Name | Quantity | Supporting Evidence |
|---|---|---|
| Oxycodone | 27 grams | Testimony of John Schisler, ECF 3448, 6:22-13:7 (purchased "Perc 30" pills from Ms. Cercone for approximately one year; bought 5 to 10 pills at a time, a few times per week; spent over $14,500 at $35/pill, which would be about 414 total pills); Trial Exs. 3-4 (wiretaps corroborate Mr. Schisler's testimony; Ms. Cercone talked to Mr. Perry about the "guy in Mt. Lebanon" who likes to buy pills; Mr. Landfried telling Mr. Perry that Ms. Cercone has "250" pills in her possession); Testimony of Larry Benavides, ECF 3448, 37:7-38:15 (tested Perc 30 pills for Mr. Landfried and Ms. Cercone to make sure they were good); Testimony of Joseph Evans, ECF 3188, 85:5-87:7 (discussed selling pills with Ms. Cercone; saw what appeared to be "a thousand" pills in her possession; Ms. Cercone confirmed that the pills came from Mr. Landfried) |
| Synthetic Cannabinoids | 100 grams | Testimony of Larry Benavides, ECF 3448, 31:25-34:2 (witnessed Ma. Cercone helping Mr. Landfried produce K2 paper in Mr. Benavides's apartment), 30:4-11 (Mr. Landfried typically produced paper in 50-to-100-page batches) |

**C.   The Court overrules Ms. Cercone's objection to applying the prison-distribution enhancement.**

Ms. Cercone next objects to adding a two-level enhancement because the drug conspiracy involved the distribution of a controlled substance in a prison under USSG § 2D1.1(b)(4). Ms. Cercone argues that she was "only convicted for the distribution of 500 or more grams of cocaine" and that "both the classified and non-classified evidence produced to date discloses no factual basis for the conclusion supporting said 2 level enhancement reached in Paragraph 17." ECF 332, p. 4. In support of her position, Ms. Cercone "invites the Court to review the [entire] trial transcript" without pointing the Court to any specific portions. *Id.*

The jury verdict was not limited to cocaine, as discussed above for Mr. Landfried. After careful review of the trial transcript, the Court concludes that there

was sufficient evidence to show that Ms. Cercone was involved in the conspiracy to distribute synthetic cannabinoids in prisons. *See, e.g.*, ECF 3186, 74:25-75:23 (Mr. Perry testifying that after the K2-soaked paper dried "[i]t would get made up in legal documents, bogus legal documents, and sent to federal prisons"); 81:13-23 (Mr. Perry testifying that he received checks from federal inmates as payment for K2-soaked paper); Trial Ex. 26; ECF 3188, 206:17-214:21 (Ms. Cercone received wire transfers for relatively large sums of money from inmates disguised as "gifts" or "child support payments").

### D. The Court overrules Ms. Cercone's objection to her total offense-level calculation.

Finally, Ms. Cercone incorporates her prior objections and argues that a total offense level of 34 is unsupported. However, because the Court overrules her other objections, it necessarily overrules this objection, as well.

## III. Anthony Smith.

Mr. Smith, for his part, raises four objections to his PSR. He objects to: (i) the description of the offense of conviction in his PSR; (ii) the drug quantities attributed to him; (iii) the application of a two-level enhancement for obstruction of justice; and (iv) the application of a two-level enhancement because the conspiracy involved the distribution of controlled substances in prison. The Court will sustain in part Mr. Smith's objections. That is, the Court will not apply a two-level enhancement for obstruction of justice. The Court overrules all of Mr. Smith's other objections.

### A. The Court overrules Mr. Smith's objection to the description of the offense of conviction in his PSR.

Mr. Smith first objects that there "are varying and inconsistent description of the offense of conviction" throughout the PSR. ECF 3333, p. 1. Specifically, he objects that controlled substances at issue are variously described as Schedule I, II, and III controlled substances because the "verdict returned in this case…reflects only

that Mr. Smith was guilty of conspiring to possess with intent to distribute and distribute synthetic cannabinoids (K2)." *Id.* at p. 2.

As the probation officer points out in the Addendum, there are not inconsistent descriptions of the offense conduct in the PSR. Pages 7 and 8 contain information related to the charges in the indictments. Those mention "Schedule III" controlled substances because the information mirrors the indictments. That said, the descriptions on pages 11 and 12 reflect only the specific offenses of conviction, as determined by the jury.

### B.   The Court overrules Mr. Smith's objections to the drug-quantity calculation in his PSR, but adopts a narrower construction for the number of greeting cards at issue.

Mr. Smith objects to the PSR's assertion that he is responsible for between 60 and 80 kilograms of converted drug weight. According to him, that calculation was based on improper "speculation and assumptions." ECF 3333, p. 3. But that's not true—the calculation is based on Mr. Smith's own testimony.

At trial, Mr. Smith testified on his own behalf. During his testimony, Mr. Smith admitted that he dealt K2 paper for "roughly six months." ECF 3189, 60:11-63:15. He stated that he obtained that paper from Mr. Landfried and someone else called "Dirk." *Id.* at 51:4-7. Mr. Landfried supplied Mr. Smith with K2 paper about ten times. *Id.* at 60:11-63:15. Usually, Mr. Landfried would give him a "few" greeting cards at a time, but sometimes it was just sheets of paper. *Id.* Based solely on this testimony, the government "conservatively" estimates that Mr. Landfried supplied Mr. Smith with a total of 25 greeting cards throughout Mr. Smith's participation in the conspiracy. ECF 3548, p. 5. While the Court agrees that this testimony establishes some quantity of greeting cards, the Court does not agree it is 25.

A "few" means a small number of units or individuals. WEBSTER'S DICTIONARY. The government's proposal that Mr. Landfried supplied 2.5 greeting cards on average

each time he supplied Mr. Smith is on the higher end of what could have been reasonably estimated.  The Court therefore will instead adopt a narrower and more conservative construction of "a few" as meaning "more than one," and finds that it was only two greeting cards on average, for a total of 20 greeting cards.  *See, e.g.*, *Douglas*, 885 F.3d at 151 ("The evidence supports the District Court's factual determination that Douglas was responsible for more than 450 kilograms of cocaine. Staples testified that Douglas smuggled '[10] or 13 kilograms' of cocaine through SFIA '40 to 50 times,' which totals between 400 and 650 kilograms of cocaine. Staples knew the amount of drugs because he provided Douglas with the cocaine, and nothing in the record suggests that his perception or memory was impaired in any way or that he provided inconsistent information on this topic.").

The government offered unrebutted testimony that a standard greeting card weighs about 20 grams.  ECF 3449, 35:9-14, 42:10-24.  Agent Truesdell explained that a "standard card" is a "five-by-eight folded card you just open like a book.  No inserts.  No pop-ups.  No batteries.  Nothing," and the 20-gram weight does not include the envelope.  *Id.* at 42:10-43:1.  Multiplying 20 grams by 20 greeting cards results in 400 grams.  The Sentencing Guidelines state that 1 gram of a Schedule I or II synthetic cannabinoid amounts to 167 grams of converted drug weight.  So, the 400 grams of greeting cards translates to 66.8 kilograms of converted drug weight, which is still greater than the 60 kilograms attributed to Mr. Smith in his PSR.

To escape this calculation, Mr. Smith advances a novel argument that has never been adopted by any federal court.  That is, Mr. Smith argues that the converted-drug-weight calculation should not include the weight of the greeting card and should only include the weight of the synthetic cannabinoid mixture added to the cards.  ECF 3559, pp. 2-7.  He bases this argument on what he believes to be the "clear and unambiguous language" of the guidelines.  *Id.*  The Court is not convinced.

It is true that when interpreting and applying the Guidelines, the Court must be guided by the plain and unambiguous language included therein. *United States v. Perez*, 5 F.4th 390, 394 (3d Cir. 2021). The relevant guideline here states that "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." § 2D1.1(c), note (A). Put another way, "drug quantity under the guidelines includes the entire weight or volume of any mixture containing a detectable amount of controlled substance, without regard to purity or concentration." *United States v. Stewart*, 761 F.3d 993, 1001 (9th Cir. 2014). "Only if a user must separate the other materials from the controlled substance prior to use should the court calculate the drug quantity without including this weight." *United States v. Ramos*, 814 F.3d 910, 920 (8th Cir. 2016) (citing USSG § 2D1.1 cmt. 1). "And only if the Guidelines Manual carves out an express exception does the mixture-or-substance rule not apply." *Id.* (citations omitted).

Here, the synthetic cannabinoids were sprayed onto an inert material—greeting cards. This paper material "was not removed prior to the drug's use, nor was it easily separable." *Id.* "Likewise, synthetic cannabinoids are not among the listed exceptions to the mixture-or-substance rule." *Id.* As a result, the proper way to measure the weight attributable to Mr. Smith is the entire weight of the mixture (*i.e.*, the combined weight of the greeting cards and the synthetic cannabinoid mixture sprayed on them). *See id.* (holding that district court did not err when it included the weight of inert plant material in determining drug-quantity weight of synthetic cannabinoids at sentencing).

Mr. Smith cites only one case from the Circuit Court of Appeals for the District of Columbia in support of his argument, but he admits that even that case comes out against him. ECF 3559, pp. 4-5. There is no good reason for the Court to depart from the reasoning set forth by two different federal appellate courts. What those courts

got right, and Mr. Smith gets wrong, is that the plain language of the Guidelines makes clear that the entire weight should be used unless there is an applicable specific exception set forth elsewhere in the Guidelines.  No such exception exists for synthetic cannabinoids, unlike several other drugs.

Mr. Smith's strained interpretation, on the other hand, misconstrues the phrase "set forth in the table."  According to Mr. Smith, because "synthetic cannabinoids" are not a controlled substance separately listed in the drug quantity table, the "unless otherwise specified" carve-out does not apply and neither does the "mixture and substance" rule.  But synthetic cannabinoids are captured in the term "Converted Drug Weight" that is listed in the Drug Quantity Table.  So synthetic cannabinoids are "set forth in the table," contrary to Mr. Smith's suggestion.

Relying on the plain language of the Guideline, then, leads to the inexorable conclusion that the entire weight of the mixture, including the greeting cards, should be used.  The Court overrules Mr. Smith's drug-quantity objection to his PSR.[4]

### C.   The Court sustains Mr. Smith's objection to the application of a two-level enhancement for "obstruction of justice."

Mr. Smith also objects to the application of a two-level enhancement to his offense level because he allegedly "willfully obstructed or impeded or attempted to impede the administration of justice" by "committing perjury."  ECF 3288, ¶ 23.  He argues that the evidence offered by the government does not support such a finding.  The Court agrees with Mr. Smith.

Mr. Smith objects to the claim that he perjured himself during his trial testimony about certain trips that he made to Washington, D.C. on two core grounds.

---

[4] Mr. Smith stresses that it is unclear which specific synthetic cannabinoid controlled substance was sprayed onto the greeting cards.  ECF 3559, pp. 9- 14.  But that's irrelevant.  The jury convicted Mr. Smith of conspiring to distribute some synthetic cannabinoid controlled substance during the time period of his testimony.  And all synthetic cannabinoid controlled substances are treated the same in the drug quantity tables in the Guidelines.

ECF 3333, p. 3.  First, he argues that he did not misrepresent whether he had "permission" for his trips to Washington, D.C.  *Id.* at pp. 3-4.  Second, he argues that he did not misrepresent whether he "went to D.C. ***with*** Noah Landfried."  *Id.* at p. 5 (emphasis in original).  After reviewing the record, the Court finds that Mr. Smith is correct on both counts.

Mr. Smith did not perjure himself about his trips to Washington, D.C.  He clarified that there were some trips for which he did not have approval and testified at trial that he was not sure about that one.  ECF 3189, 77:1-20.  As for going to Washington, D.C. "with" Noah Landfried, the evidence offered by the government, at best, establishes that the two men were in the city at the same time.  It does not establish that they traveled to Washington, D.C. together.

Mr. Smith next objects to the claim that he made misrepresentations to the Court in a letter he sent in May 2020 in support of his request to be released pending trial.

In that letter, Mr. Smith wrote that he "wasn't in possession of any drugs or weapons."  ECF 1952, p. 3.  Read in isolation, that statement appears to conflict with Mr. Smith's later trial testimony that he distributed synthetic cannabinoids.  But when read in the proper context, that is not the case.  At that point in the letter, Mr. Smith is making arguments about the strength of the government's evidence against him—one of the factors under the Bail Reform Act.  This is what he wrote, in full: "My name is not mentioned in any affidavit, DEA report, lab report, and I wasn't in possession of any drugs or weapons."  *Id.*  The at-issue statement comes next and is clarifying that it was Mr. Smith's understanding that the DEA and lab reports in the case did not show that he was in the possession of any drugs, and, as such, the

strength of the evidence factor supported his release.[5]  That statement cannot serve as the basis for an obstruction of justice enhancement.[6]

As a result, the Court will not include a two-level enhancement under USSG § 3C1.1 in its final calculation of Mr. Smith Sentencing Guidelines range.

### D. The Court overrules Mr. Smith's objection to the application of a two-level enhancement for distribution in prison.

Finally, Mr. Smith objects to the two-level enhancement under USSG § 2D1.1(b)(4) "[b]ecause the offense involved the distribution of controlled substances in prison." ECF 3333, p. 7.  Mr. Smith objects to this enhancement because the evidence "does not demonstrate that 'the object' of the conspiracy was distribution of controlled substances to prisons, correctional facilities, or detention facilities." *Id.* at p. 8.

Mr. Smith testified that he supplied K2 paper to Thomas Hopes while Mr. Hopes was incarcerated in a federal prison.  ECF 3189, 73:1-74:22.  That is enough to justify the application of the enhancement.  *See United States v. Smith*, 824 F. App'x 508, 512 (9th Cir. 2020) (applying enhancement where "Smith asked Rodriguez to provide him with illegal narcotics for distribution while he was imprisoned").  But the evidence goes beyond just Mr. Smith's admissions.  The testimony at trial

---

[5] That Mr. Smith appeared to admit this statement was "false" during his testimony at trial is of no moment.  The government asked him to read the key sentence in isolation.  ECF 3189, 81:25-82:2 ("Do you see a sentence near the top? It's highlighted in green.").  It's not clear Mr. Smith appreciated the full context of the sentence in a letter that he wrote over a year earlier.

[6] Mr. Smith also objects to the application of a two-level enhancement under USSG § 3C1.1 based "around law enforcement's failed attempts at detaining [him] after the issuance of a warrant for his arrest."  ECF 3333, p. 6.  It does not appear that this conduct serves as the basis for the enhancement in the PSR.  ECF 3354.  But if it did, Mr. Smith correctly points out that the fact of "avoiding or fleeing from arrest" is conduct ordinarily not covered by USSG § 3C1.1.  *See* USSG § 3C1.1, comment 5(D).

established that Mr. Landfried created a sophisticated scheme for smuggling drugs into prisons and then laundering money to disguise the proceeds. Mr. Smith was a part of that drug-trafficking conspiracy. The enhancement applies. *See United States v. Vance*, No. 20-5819, 2021 WL 5133250, at *10 (6th Cir. Nov. 4, 2021) (applying enhancement where the "object of the offense in Count 19, i.e., smuggling drugs to Kitchens for distribution within the Hamilton County Jail"), *cert. denied,* 142 S. Ct. 1693 (2022).

## CONCLUSION

For these reasons, the Court sustains in part Mr. Smith's objections to his PSR and overrules all of Defendants' other objections. An order follows.

Dated: August 16, 2022                     BY THE COURT:


                                           /s/ *J. Nicholas Ranjan*
                                           United States District Judge